## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### CHARLOTTESVILLE DIVISION

| | | |
|---|---|---|
| RED LIGHT MANAGEMENT, INC., | | CASE NO. 3:15–cv–00051 |
| | *Plaintiff,* | |
| v. | | MEMORANDUM OPINION |
| DAN DALTON, | | |
| | *Defendant.* | JUDGE NORMAN K. MOON |

This matter is before the court upon plaintiff Red Light Management, Inc.'s ("Red Light") Motion for Entry of Default Judgment (docket no. 14) and defendant Dan Dalton's Motion to Set Aside Default (docket no. 8). Because Dalton has failed to satisfy Rule 55(c)'s good cause requirement, I will deny Defendant's motion and grant Plaintiff's motion.

### I.    BACKGROUND

A.  FACTUAL BACKGROUND

This case arises out of Dalton's purported breach of an employment agreement he entered into with Red Light. Specifically, Red Light alleges that Dalton failed to repay advances and share post-termination commissions. The particulars of the employment agreement are discussed below.

i.    Recoupable Advances

Red Light and Dalton entered into an employment agreement ("the Agreement") in January 2009. Red Light agreed to advance Dalton (1) a draw, treated as "an advance recoupable by Red Light," of $225,000 per year, and (2) advances for overhead expenses, including the cost of providing an office, staff, and travel (collectively, "the Advances"). Docket No. 1, Ex. A, at 3.01, 4.01–4.02 (hereinafter, "Agreement").

Red Light was entitled to recoup these Advances during the term of the Agreement from commissions Dalton earned as an artist manager. Specifically, Red Light was entitled to one-hundred percent of commissions Dalton earned during the term of the Agreement in order to repay the Advances, subject to certain adjustments not relevant here. *See* Agreement 3.01, 4.01–4.02.

  ii. <u>In-Term Commission Sharing Provisions</u>

If Dalton repaid the Advances during the term of the Agreement, Red Light and Dalton would share commissions pursuant to the following scheme. For an Existing Client,[1] Dalton would receive two-thirds and Red Light would receive one-third of the commissions. Agreement 4.03(b)(i)(A). For a New Client,[2] Dalton would receive one-third and Red Light would receive two-thirds of the commissions. *Id.* at 4.03(b)(i)(B).[3]

  iii. <u>Post-Termination Commission Sharing Provisions</u>

The Agreement also contained post-termination commission sharing provisions that varied based on whether Red Light or Dalton continued to manage the client in question ("the Post-Termination Commission Sharing Provisions").[4]

If Dalton managed the clients during the post-termination period,[5] Red Light was entitled to fifty percent of the commissions they would have received during the term of the Agreement.

---

[1] An "Existing Client" is a client Dalton managed prior to joining Red Light. Agreement 1.04(a).

[2] A "New Client" is a client Dalton began managing after joining Red Light. *Id.* at 1.04(a).

[3] These provisions are not at issue in this case. Dalton failed to repay the Advances during the term of the agreement, and so they were inapplicable.

[4] The length of the post-termination provisions differed for New Clients and Existing Clients. For an Existing Client, the post-termination provision lasted one year for every one year that Dalton was employed at Red Light. For a New Client, the post-termination provision lasted two years for every one year that Dalton was employed at Red Light. *Id.* at 4.04(a)(i)–(ii). Dalton was employed by Red Light for six years. Accordingly, the post-termination provision lasted six years for Existing Clients and twelve years for New Clients.

Accordingly, Red Light would be entitled to roughly one-sixth ($16^{2/3}$%) of commissions from Existing Clients and one-third of commissions from New Clients. Agreement 4.04(b)(i)–(ii).

Conversely, if Red Light managed the clients during the post-termination period, Dalton was entitled to fifty percent of the commissions he would have received during the term of the Agreement. Accordingly, Dalton would be entitled to one-third of commissions from Existing Clients and roughly one-sixth of commissions from New Clients. *Id.* at 4.04(c)(i)–(ii).

iv.     Post-Termination Override Provision

The Agreement contained a provision that would override the Post-Termination Commission Sharing Provisions in the event that Dalton had not repaid the Advances during the term of the Agreement ("the Override Provision").[6] In such case, Red Light would be entitled to one-hundred percent of post-termination commissions from New Clients and fifty percent of post-termination commissions from Existing Clients. This override provision expired once Dalton repaid the Advances, and the Post-Termination Commission Sharing Provisions outlined above would take effect. Agreement 4.04(d).

v.     Dalton Had No Obligation to Share Post-Termination Commissions from Existing
       Clients Once the Advances were Recouped

It is worth noting one particularity of the Post-Termination Commission Sharing Provisions. As noted above, the Provisions provide that in the event Dalton continued to manage an Existing Client during the post-termination period, Red Light would be entitled to roughly one-sixth of the commissions generated from those clients. The Agreement provides, however,

---

[5] Dalton managed two clients during his term of employment with Red Light: Damian Marley, an Existing Client, and Flogging Molly, a New Client. Dalton continued to manage these clients after his employment with Red Light ended.

[6] Dalton owed Red Light $1,061,372.31 in Advances as of the date of his voluntary separation from Employment. Accordingly, the Override Provision, rather than the Post-Termination Commission Sharing Provisions, governed.

that "Red Light shall not be entitled to a Post-Term Commission in respect of Existing Clients following such time as Red Light has recouped the unrecouped portion of the [Advances]" (hereinafter, "the Knockout Provision"). Agreement 4.04(b). Accordingly, once the Advances had been recouped, Red Light would not be entitled to a share of post-termination commissions from Existing Clients.

If, however, Dalton had not repaid the Advances, the Agreement's Override Provision would govern. Accordingly, Red Light would be entitled to fifty percent of post-termination commissions from Existing Clients. Once Dalton repaid the Advances, Red Light would seemingly then be entitled to roughly one-sixth of post-termination commissions from Existing Clients. This is not so, though, because if Dalton had repaid the Advances, the Knockout Provision would take effect, thus knocking out the provision that Dalton share post-termination commissions from Existing Clients. In sum, then, Red Light would never be entitled to post-termination commissions from Existing Clients as long as Dalton had repaid the Advances. For that reason, paragraph 4.04(b)(i)[7] of the Agreement has no effect.[8]

B. PROCEDURAL HISTORY

    i.    Dalton's Voluntary Termination and Engagement of Counsel

Dalton voluntarily terminated his employment with Red Light on September 30, 2014. Red Light notified two separate Los Angeles law firms by letter dated August 7, 2015, that Dalton had purportedly failed to repay post-termination commissions. Dalton authorized the Los Angeles law firm King, Holmes, Paterno, & Berliner, LLP ("KHPB"), to address Red Light's

---

[7] "For Existing Clients, [if Dalton manages the client, Red Light is entitled to] sixteen and two-thirds ($16^{2/3}\%$) percent of the Post-Term Commission . . . ."

[8] In this way, the Post-Termination Commission Sharing Provisions are not perfectly reciprocal: Red Light must pay a post-termination commission to Dalton if Red Light manages an Existing Client, but Dalton need not do so if he manages the client. The structure is therefore more favorable to Dalton than to Red Light.

- 4 -

allegations and to attempt to resolve the dispute with Red Light. Peter Paterno of KHPB informed Dalton that he would negotiate with Red Light to reach a resolution.

ii.    Dalton's Failure to Respond to Red Light's Complaint

Red Light filed a complaint on September 15, 2015, in this court. Red Light legally served Dalton in person on October 26, 2015, and responsive pleadings were due twenty-one days later. Dalton failed to file responsive pleadings, and the clerk entered default on November 18, 2015.

After being personally served, Dalton erroneously assumed KHPB was negotiating with Red Light. He further assumed that KHPB was handling the complaint and summons, and that they would make arrangements with Red Light to resolve the case. For those reasons, Dalton took no further action. Dalton contacted KHPB in December 2015 and learned for the first time that they were unaware of the complaint and summons. Dalton learned sometime thereafter that Red Light had obtained entry of default against him.

## II.    STANDARD OF REVIEW

When confronted with a motion for default judgment, a court may either grant the motion pursuant to Rule 55(b)(2), or set aside the entry of default for good cause pursuant to Rule 55(c). "Once a party defaults, the issue of whether to grant or deny a motion for entry of default judgment is a matter largely within the discretion of the trial court." *Broglie v. Mackay–Smith*, 75 F.R.D. 739, 742 (W.D.Va.1977); *Payne ex rel. Estate of Calzada v. Brake*, 439 F.3d 198, 204 (4th Cir. 2006) ("'The disposition of motions made under Rule[ ] 55(c) . . . is a matter which lies largely within the discretion of the trial judge and his action is not lightly to be disturbed by an appellate court.'" (quoting *Consol. Masonry & Fireproofing, Inc. v. Wagman Const. Corp.*, 383 F.2d 249, 251 (4th Cir.1967))). The great weight of authority holds that "the interests of justice

- 5 -

are best served by a trial on the merits." *Tolson v. Hodge*, 411 F.2d 123, 130 (4th Cir. 1969) (citation and quotations marks omitted). Accordingly, "Rule[] 55(c) . . . [is] to be liberally construed in order to provide relief from the onerous consequences of defaults." *Id.*; *accord United States v. Moradi*, 673 F.2d 725, 727 (4th Cir. 1982). Furthermore, "[a]ny doubts about whether relief should be granted should be resolved in setting aside the default so that the case may be heard on the merits." *Tolson*, 411 F.2d at 130 (citation and quotation marks omitted).

In determining whether the defaulting party has demonstrated good cause, a district court considers the following factors: (1) whether the defendant has a meritorious defense to the substance of the plaintiff's case; (2) whether the defendant acted with reasonable promptness to set aside the entry of default; (3) whether the defendant has a history of dilatory action within the litigation; (4) the personal responsibility of the party opposing default judgment in causing the default; (5) whether the defendant's default prejudiced the plaintiff; and (6) whether there are less drastic sanctions available. *Estate of Calzada*, 439 F.3d at 204–05.

### III.   DISCUSSION

I find that the factors weigh against setting aside default, and in favor of entering default judgment.

#### A. MERITORIOUS DEFENSE

Dalton has failed to articulate a meritorious defense. "A meritorious defense requires a proffer of evidence which would permit a finding for the defaulting party . . . ." *Augusta Fiberglass Coatings, Inc. v. Fodor Contracting Corp.*, 843 F.2d 808, 812 (4th Cir. 1988) (citing cases). There must be facts to support the defense, not merely conclusory statements. *Burton v. TJX Cos., Inc.*, No. 3:07-CV-760, 2008 WL 1944033, at *3 (E.D. Va. May 1, 2008). This

- 6 -

standard favors the party opposing entry of default. *Id.* (citing *Augusta Fiberglass,* 843 F.2d at 812).

Dalton has presented no evidence regarding a meritorious defense, instead relying on a purely legal argument that challenges the term of the contract. Indeed, Dalton does not dispute the principal facts that Red Light advanced him money or that he has earned post-termination commissions from his clients. At any rate, Dalton's legal challenges to the Agreement lack merit.

i.   Covenant Not to Compete

Dalton argues that the post-termination provisions function as an unlawful covenant not to compete under prevailing Virginia law. This argument is unpersuasive—the Agreement in question simply does not contain and does not function as a covenant not to compete.

First, the Agreement lacks any explicit prohibition on post-termination competition. The Agreement does not prohibit Dalton from servicing Red Light clients or from taking clients with him when he leaves Red Light. Indeed, the Agreement contemplates that he will do so. *See, e.g.*, Agreement 4.04(b) (detailing commission sharing provisions should Dalton manage clients post-termination). This fact distinguishes the Agreement from other contracts which Virginia courts have found to be covenants not to compete. *See, e.g., Preferred Sys. Sols,, Inc. v. GP Consulting, LLC*, 732 S.E.2d 676, 679–680 (Va. 2012) (covenant not to compete containing explicit prohibition on post-termination competition).

Second, the cases on which Dalton relies—*Foti v. Cook*[9] and *Leon M. Reimer & Co., P.C. v. Cipolla*[10]—are distinguishable.

In *Foti*, the Virginia Supreme Court found the following provision to be a covenant not to compete: "During the twenty-four months immediately following . . . termination . . . a partner

---

[9] 263 S.E.2d 430 (Va. 1980).

[10] 929 F. Supp. 154 (S.D.N.Y. 1996).

- 7 -

will not offer to perform or perform services . . . to any client of the partnership. A partner violating [this prohibition] shall pay . . . one-third of each year's fee collected for a period of three years." *Foti*, 263 S.E.2d at 431 n.1. Thus, the agreement in *Foti* contained an explicit unilateral prohibition on post-termination competition that featured a penalty of one-third fee.

The Agreement in this case contains no explicit prohibit on competition. Moreover, the Post-Termination Commission Sharing Provisions are reciprocal, rather than unilateral. They apply to both Dalton and Red Light.[11] Moreover, the Agreement's Override Provision is designed as a debt collection mechanism. The covenant not to compete in *Foti* was designed to deter the exiting partner from competing post-termination. The Agreement in our case is thus not analogous to covenant not to compete in *Foti*.

*Reimer* is distinguishable for similar reasons. The United States District Court for the Southern District of New York found the following agreement to be a covenant not to compete: "In the event Employee accepts an engagement from a client of the Corporation [for a period of time post-termination,] Employee shall . . . pay to the Corporation [a sum of money]." *Reimer*, 929 F. Supp. at 155–56. The employee was exempt from paying a fee if it "obtained Leon Reimer's express written confirmation . . . ." *Id.* at 156.

It is true the agreement in *Reimer* did not contain an explicit prohibition on post-termination competition. Nevertheless, like the covenant not to compete featured in *Foti*, the agreement in *Reimer* imposed a unilateral fee on an employee for servicing clients of the firm. This unilateral penalty is absent from the Agreement in our case. The Agreement here features a reciprocal obligation to share post-termination commissions and to pay a debt: it does not contain a unilateral penalty intended to deter Dalton from servicing Red Light's clients.

---

[11] And as discussed *supra*, I.A.v. n.8, the provisions are actually less favorable to Red Light, as they have to pay a commission should they manage an Existing Client post-termination, while Dalton has no such obligation. In *Foti*, the contract was substantially less favorable to the exiting party.

Third, the Agreement does not in any case function as a covenant not to compete. The contracts in *Foti* and *Reimer* imposed a penalty on the exiting employee for servicing a client of the firm. The penalties were designed to make it too costly for the employee to service clients. The inverse is true here: Dalton does substantially better if he *services the clients* than if he does not.[12]

Assume that Red Light has recouped the Advances, thus triggering the Post-Termination Commission Sharing Provisions. Further, say that Existing Client Damian Marley and New Client Flogging Molly each generate $500,000 in post-termination commissions.[13] If Red Light manages each client post-termination, Dalton would be entitled to $166,666.66 from Existing Client Damian Marley (one-third share) and roughly $83,333.33 from New Client Flogging Molly (roughly one-sixth share) for a total of $249,999.99.

If Dalton manages each client post-termination, Dalton would be entitled to all $500,000 from Existing Client Damian Marley[14] and $333,333.33 from New Client Flogging Molly (two-thirds share) for a total of $833,333.33. Dalton thus stands to gain over three times more money if he manages clients post-termination than if he does not. Rather than incentivizing—much less explicitly prohibiting—Dalton from competing post-termination, the Agreement is structured so that it is in Dalton's interest to do so.

In sum, the Agreement does not explicitly prohibit Dalton from competing, is not analogous to the covenants not to compete in *Foti* and *Reimer*, and does not function as a

---

[12] At any rate, Dalton receives money even if the clients stay with Red Light. This reciprocal post-termination commission sharing provision is absent from *Foti* and *Reimer*, where the exiting party received nothing.

[13] This is an estimate. The court does not have before it evidence regarding the amount of commissions generated by either of those clients. Nevertheless, Dalton's counsel represented to the court that Damian Marley generated at least $600,000 in post-termination commissions for 2015. The court's estimate is thus plausible if modest.

[14] See *supra*, I.A.v. n.8.

covenant not to compete. Accordingly, Dalton's argument that the agreement is an unlawful covenant not to compete fails as a meritorious defense.

### ii. Unenforceable Penalty

Dalton also claims that the post-termination provisions function as an unlawful penalty under Virginia law. This argument fails.

Unenforceable penalties most often take the form of liquidated damages provisions that grossly exceed the party's anticipated damages. *See, e.g.*, *Perez v. Capital One Bank*, 522 S.E.2d 874, 875 (Va. 1999). They represent the parties' *ex ante* attempt to calculate uncertain or unquantifiable damages, but that do so in ways that bear little relationship to the party's actual damages. The Override Provision challenged here deals with a sum certain—the total amount of the Advances Red Light gave Dalton. The Override Provision is a debt collection mechanism designed to recoup Red Light's Advances. Once the Advances are recouped, the Override Provision terminates. Accordingly, it has none of the characteristics of an unenforceable penalty. Dalton's argument that the Override Provision functions as an unlawful penalty thus fails as a meritorious defense.

### iii. Other Defenses

Dalton's other articulated defenses can be dismissed out of hand. Red Light filed this breach of contract action within one year after Dalton was terminated. This does not present a statute of limitations issue. There is no plausible waiver defense. Finally, that specific performance may not be available is not a defense on the merits. Accordingly, Dalton has failed to articulate any meritorious defenses.

B.  RＥＡＳＯＮＡＢＬＥ ＰＲＯＭＰＴＮＥＳＳ

Dalton has not acted with reasonable promptness. Whether a party has acted with reasonable promptness to set aside entry of default must be determined "in light of the facts and circumstances of each occasion . . . ." *Moradi*, 673 F.2d at 727. "[C]ourts routinely look at other courts' decisions to determine whether a delay is reasonable," and "[d]istrict courts in the Fourth Circuit have found that a defendant acted reasonably promptly when waiting seventeen, twenty-one, and thirty-two days after default was entered before attempting to set it aside." *Burton*, 2008 WL 1944033, at *3; *see also JTH Tax, Inc. v. Callahan*, No. 2:12CV691, 2013 WL 3035279, at *9 (E.D. Va. June 6, 2013) (holding that defendant acted with reasonable promptness in filing a motion to set aside default sixteen days after default was entered).

Here, Red Light filed its Motion for Clerk's Entry of Default on November 17, 2015, and the Clerk entered default on November 18, 2015. Dalton did not file his Motion to Set Aside Default until January 20, 2016—sixty-four days after entry of default. This sixty-four day period is greater than the seventeen, twenty-one, and thirty-two day periods found reasonable.

This court has set aside a delay of approximately 10 weeks in *Belvac Prod. Mach., Inc. v. Std. Indus. Prods. Co.*, No. 6:06cv00034, 2007 WL 1189644 (W.D. Va. April 23, 2007). *Belvac* is, however, distinguishable. In *Belvac*, a third-party defendant defaulted. *Belvac*, 2007 WL 1189644, at *1. When the third-party made an appearance in the case, it brought with it a substantial amount of factual evidence that supported its meritorious defense. Thus, although the third-party defendant did not act with reasonable promptness, the delay was mitigated to some extent by its evidence of a meritorious defense.

Here, Dalton, the original defendant, has delayed substantially without presenting *any* evidence regarding a meritorious defense. Indeed, Dalton has proffered no evidence at all,

- 11 -

instead relying on a purely legal argument that challenges the terms of the contract. Dalton does not dispute that Red Light made the Advances or that he has received post-termination commissions. Accordingly, the special circumstances present in *Belvac* are absent here. Dalton has therefore unreasonably delayed.

### C. PERSONAL RESPONSIBILITY

Dalton is personally responsible for the delay. Dalton personally received the complaint and summons, and yet did nothing, assuming that KHPB would "make arrangements regarding the Complaint and Summons." *See* Docket No. 9, at 2. Dalton did hire counsel to negotiate a settlement with Red Light, and thus displayed some responsibility. There is no excuse, however, for taking no steps—not a single phone call, email, or text message to counsel—when served with the summons and complaint. This factor weighs against setting aside the entry of default.

### D. DILATORY ACTION

Nothing in the record indicates any previous history of dilatory action by Dalton. Indeed, Dalton's filings have been timely since he entered this action. *See, e.g.*, Docket No. 17 (Dalton's timely-filed Memorandum in Opposition). This factor therefore weighs in favor of setting aside the default.

### E. PREJUDICE TO THE PLAINTIFF

There is no evidence Red Light has been prejudiced by Dalton's delay. In determining whether a party was prejudiced by a default, a court considers: (1) whether the delay made it impossible for the aggrieved party to present certain evidence; (2) whether the delay hampered the non-defaulting party's ability to proceed with trial; (3) whether the delay impaired the non-defaulting party's ability to complete discovery; and (4) whether the delay was used by the defaulting party to commit a fraud. *Lolatchy v. Arthur Murray, Inc.*, 816 F.2d 951, 952–53 (4th

- 12 -

Cir. 1987); *Burton*, 2008 WL 1944033, at \*4. There is no evidence any of these factors are present.

Red Light does suggest that the delay might make it possible for Dalton to "move and hide assets." *See* Docket No. 12, at 13. This speculative suggestion is not, however, supported by anything in the record. Accordingly, it does not support a finding of prejudice. The fourth factor therefore weighs in favor of setting aside the entry of default.

F. AVAILABILITY OF LESSER SANCTIONS

This court has held repeatedly that requiring a defaulting party to pay the non-defaulting party's fees and costs associated with seeking entry of default and default judgment is an appropriate and less drastic sanction than entry of default judgment. *See, e.g.*, *Lolatchy*, 816 F.2d at 953 (holding that when a party defaults, an award of fees and costs is an appropriate lesser sanction); *Burton*, 2008 WL 1944033, at \*5 (same); *see also Capital Concepts*, 2014 WL 3748249, at \*9; *Kristensen ex rel. v. Spotnitz*, No. 3:09cv00084, 2010 WL 8753554, at \*4 (W.D. Va. July 30, 2010). There is nothing in this case that would make this remedy inappropriate. Accordingly, this factor weighs in favor of setting aside the default.

IV. CONCLUSION

In sum, Dalton (1) has failed to articulate a meritorious defense, (2) delayed unreasonably, and (3) is personally responsible for the delay. Although it is true Dalton has no history of dilatory action, that Red Light is not prejudiced by the delay, and that lesser sanctions are available, these factors do not outweigh the first three.

Accordingly, I will deny Dalton's Motion to Set Aside Default and grant Plaintiff's Motion for Entry of Default Judgment.

The Clerk of the Court is hereby directed to send a certified copy of this memorandum opinion and the accompanying order to all counsel of record.

Entered this ___5th___ day of April, 2016.

NORMAN K. MOON
UNITED STATES DISTRICT JUDGE